# Supreme Court of Texas

No. 19-0831

Courtney N. Phillips, Executive Commissioner; Sylvia Hernandez Kauffman, Inspector General; and Texas Health and Human Services Commission,

*Petitioners,*

v.

John McNeill, Jr., R.Ph.; and Nichols Southside Pharmacy,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued September 15, 2021**

JUSTICE BUSBY delivered the opinion of the Court.

Justice Young did not participate in the decision.

This case concerns whether Corpus Christi pharmacist John McNeill, who participated in a Medicaid drug program run by the Texas Health and Human Services Commission, was entitled to an administrative contested-case hearing of his challenge to the results of a program audit by the Commission. We also consider whether

McNeill's request that the trial court make findings of fact and conclusions of law extended the deadline to file his notice of appeal under Texas Rule of Appellate Procedure 26.1.

We hold that a request for findings and conclusions extends the appellate timetable if the trial court proceeding was the type where evidence could be considered and evidence was before the trial court. Under this rule, McNeill's appeal was timely.

We further hold that the Commission's Inspector General acted *ultra vires* in failing to perform her ministerial duty to provide McNeill a contested-case hearing under section 531.1201 of the Government Code, and that she is not entitled to sovereign immunity. Accordingly, we reverse the court of appeals' judgment and render judgment requiring the Inspector General to docket a request for a contested-case hearing.

## BACKGROUND

John McNeill is the pharmacist in charge and sole shareholder of Nichols Southside Pharmacy in Corpus Christi.[1] In 2005, McNeill contracted with the Health and Human Services Commission through its Vendor Drug Program (VDP) to provide pharmaceutical services for patients enrolled in Medicaid and other state health-care programs. McNeill's contract with the VDP incorporated the Commission's rules for administering the program, including an agreement to be subject to periodic audits overseen by the Commission's Office of Inspector General. *See* 1 TEX. ADMIN. CODE § 354.1891(a) – (b).

---

[1] We refer to McNeill and the pharmacy collectively as McNeill.

2

The Commission audited McNeill in 2012. The auditor reviewed McNeill's claims for reimbursement between 2007 and 2010 and determined that he had been overpaid by $70,266.36. In response to the audit, McNeill retained counsel to challenge the Commission's estimation methodology and provided additional documentation for the auditor to review. The Commission issued an updated audit report that reduced the overpayment to $69,911.48, and it informed McNeill that he had the right to an informal agency hearing. McNeill requested a hearing, which resulted in the Commission issuing a final notice that reduced the overpayment amount to $64,549.30. The Commission informed McNeill that a vendor hold would be placed on his account until he either paid the sum or entered into a payment plan.

A week after the Commission's final notice, McNeill requested a contested-case hearing before the State Office of Administrative Hearings (SOAH).[2] McNeill contended that the Recoupment-Appeal Statute—section 531.1201 of the Government Code—provided for such a hearing. The Commission denied the request. Two days later, McNeill made a second request. The Commission refused and placed a vendor hold on McNeill's account. McNeill again asserted his right to a contested-case hearing, this time under Chapter 2260 of the Texas Government Code governing claims against state agencies for breach of contract. The Commission denied the request once again, reiterating its

---

[2] TEX. GOV'T CODE § 2001.003(1) ("Contested case means a proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing.") (internal quotations omitted).

belief that McNeill had already received the only hearing to which he and his pharmacy were entitled.

McNeill then sued the Commission, its Commissioner, and its Inspector General in their official and individual capacities in Travis County district court. McNeill's complaint sought, among other things, a declaration that he was entitled to a contested-case hearing under the Recoupment-Appeal Statute, certain administrative rules, and the Due Process Clause of the Texas and U.S. Constitutions. He also requested injunctive relief compelling the Commission and officials to provide him a contested-case hearing and a temporary restraining order against the Commission withholding more than the amount of the claimed overpayment. The Commission and McNeill entered into a Rule 11 agreement that the Commission would not continue to withhold more than the amount it had determined McNeill overpaid.

The Commission filed a plea to the jurisdiction based on sovereign immunity. The trial court held a bench trial, after which it granted the plea and dismissed McNeill's claims for declaratory relief. It also denied McNeill's petition for a writ of mandamus. After the trial court signed its judgment, McNeill requested findings of fact and conclusions of law, which the court made. Eighty-seven days after the final judgment was signed, McNeill filed his notice of appeal.

The court of appeals reversed and remanded. 585 S.W.3d 109, 123 (Tex. App.—Houston [14th Dist.] 2019). The court concluded unanimously that it had appellate jurisdiction because the request for findings and conclusions made McNeill's notice of appeal timely. *Id.* at 115. The panel then split. The majority determined that McNeill had a

4

right to a contested-case hearing on federal due-process grounds. *Id.* at 116–23. The majority did not reach the question whether McNeill had a non-constitutional right to a hearing. In her dissent, then-Justice Christopher contended that the majority had reached the constitutional question improperly and resolved it incorrectly. *Id.* at 124–27 (Christopher, J., dissenting).

In this Court, the Commission challenges the court of appeals' jurisdiction, arguing that McNeill's appeal was untimely. The Commission also contends that the court of appeals failed to consider the Commission's assertion of sovereign immunity. Finally, the Commission asserts that it was not required by regulation, statute, or the U.S. or Texas Constitutions to provide McNeill a contested-case hearing. We address each of these issues in turn.

## ANALYSIS

### I. The request for findings and conclusions extended McNeill's deadline to file his notice of appeal.

Texas Rule of Appellate Procedure 26.1 provides that a notice of appeal must be filed within thirty days after judgment unless "any party timely files . . . a request for findings of fact and conclusions of law if findings and conclusions either are required by the Rules of Civil Procedure or . . . could properly be considered by the appellate court." TEX. R. APP. P. 26.1(a)(4). When one party files a request for findings and conclusions that could properly be considered on appeal, any party that wishes to appeal has ninety days after judgment to file its notice. *Id.* 26.1(d).

We have addressed the relationship between requests for findings and conclusions and the appellate timetable before, most instructively

5

in *IKB Industries (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440 (Tex. 1997), and *Gene Duke Builders, Inc. v. Abilene Housing Authority*, 138 S.W.3d 907 (Tex. 2004) (per curiam). Both cases support the conclusion that McNeill benefitted from the extended filing deadline and his notice of appeal was therefore timely.

The sole question in *IKB Industries* was whether a request for findings and conclusions following dismissal of a case as a sanction for discovery abuse extended the time for perfecting an appeal.[3] We held that although a request for findings and conclusions does not extend the deadline "where findings and conclusions can have no purpose and should not be requested," a timely request for findings and conclusions extends the timetable where they are "not without purpose—that is, they could properly be considered by the appellate court." *IKB Indus.*, 938 S.W.2d at 443. As examples, we mentioned the following categories of non-jury proceedings in which findings could properly be considered: judgments after a conventional bench trial, default judgments on claims for unliquidated damages, judgments rendered as sanctions, and judgments "based in any part on an evidentiary hearing." *Id.*

We expanded *IKB Industries*' holding a few years later in *Gene Duke Builders*. The issue there was whether Gene Duke Builders

---

[3] When *IKB Industries* was decided in 1994, Rule of Appellate Procedure 41(a) addressed this issue. In 1997, we promulgated new rules of appellate procedure, and Rule 26.1 now governs the timeline for civil appeals. Former Rule 41(a) provided that parties have thirty days after judgment to file an appeal, or "ninety days after the judgment is signed . . . if any party has timely filed a request for findings of fact and conclusions of law in a case tried without a jury." The changes in language from Rule 41(a) to Rule 26.1 do not affect our reasoning in *IKB Industries* on the point at issue here.

extended its time for filing a notice of appeal under Rule 26.1 by requesting findings and conclusions after the trial court granted defendant Pro-Line's plea to the jurisdiction. The court of appeals concluded that the appeal was untimely because the trial court had held no evidentiary hearing, but we disagreed. "Although Duke made no formal offer of evidence at the hearing on the plea to the jurisdiction, it submitted a deposition, affidavits, and exhibits attached to its pleadings." *Gene Duke Builders*, 138 S.W.3d at 908. We held that the trial court did not have to hold an evidentiary hearing based on formal offers of evidence; rather, any taking of evidence could trigger the filing extension.

Drawing on *IKB Industries* and *Gene Duke Builders*, we adopt the following two-step inquiry for determining when requests for findings and conclusions that are not required by the rules will trigger the extended ninety-day filing deadline. First, was the non-jury proceeding a type in which the trial court could consider evidence? *See IKB Indus.*, 938 S.W.2d at 443. Second, if so, was there evidence before the court? *See Gene Duke Builders*, 138 S.W.3d at 908. When the answer to both questions is yes and a party requests findings and conclusions, all parties benefit from the extended appellate timetable.

The first question is categorical, not case-specific. For example, it will be answered yes for a judgment following a bench trial, a default judgment on a claim for unliquidated damages, a judgment rendered as sanctions, and any other judgment that could be based in any part on an evidentiary hearing. *See IKB Indus.*, 938 S.W.2d at 443.

The second question is case-specific and focuses on whether evidence was presented to the trial court, not whether that evidence proved to be necessary in hindsight. In answering this question, it is not relevant whether the evidence presented was disputed, or jurisdictional, or material to an issue later raised on appeal.

Together, these questions tell us whether the trial court could have based any part of its judgment on the evidence presented. If so, then findings and conclusions by the trial court "could properly be considered" on appeal, TEX. R. APP. P. 26.1(a)(4), and a timely request for them will extend the appellate timetable.

We note that when a party submits evidence but the trial court is silent or the record is unclear regarding whether it considered that evidence, the second question should be answered yes. The purpose of Rule 26.1, as we explained in *IKB Industries*, "is to allow time for the court to make [findings and conclusions] and the parties to consider them," even if "[o]ften, perhaps usually, the decision to appeal is not controlled by the court's findings and conclusions." 938 S.W.3d at 443. Allowing an extended appellate timetable in unclear cases best promotes this purpose.

Applying this two-part inquiry here, we conclude that findings could properly be considered on appeal, and therefore McNeill's request for them extended the appellate timetable. On the first question, the trial court rendered judgment after a bench trial, which is a type of non-jury proceeding in which evidence can be considered. *Id.* As to the second question, the parties presented evidence to the trial court. The court also recited in its judgment that it had reviewed "the petitions for

relief, the responses thereto, the admissible evidence [and] the arguments of counsel" in reaching its decision. This express reference to considering evidence is sufficient—though not necessary—to show that the second question should be answered yes.

The Commission contends that McNeill's request for findings and conclusions did not extend his filing deadline because even though the trial court properly took evidence, no factual determinations were necessary for the court to issue its judgment. In the Commission's view, findings and conclusions are "categorically inappropriate" on a plea to the jurisdiction and cannot extend the deadline for filing a notice of appeal where there is no issue of jurisdictional fact.[4] This is exactly the kind of retrospective factual review our two-step inquiry avoids. The question is not whether the trial court *had* to consider evidence to render judgment, but whether it received evidence it *could* consider.

The Commission is correct that the issues McNeill raises on appeal are legal questions, not factual ones. But other aspects of the bench trial presented factual disputes for the trial court to resolve. For purposes of calculating the appellate timetable, it makes no difference

---

[4] In support of its position, the Commission cites our decision in *Texas Department of Parks and Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004). There, we recognized that a court considering a plea to the jurisdiction challenging the existence of jurisdictional facts can examine evidence to determine whether there is a material factual dispute, but that such disputes must be resolved by the finder of fact if they also implicate the merits. *Id.* at 227–28. As we held in *Gene Duke Builders*, however, there are cases in which trial court findings on a plea to the jurisdiction can properly be considered by an appellate court. 138 S.W.3d at 908. And in this case, the trial court not only ruled on a plea to the jurisdiction, but also served as the fact finder in a bench trial.

9

that the trial court's findings regarding the nature of the informal review process provided to McNeill, the method the Inspector General used to calculate McNeill's alleged overpayment, and the Commission's compliance with the parties' Rule 11 agreement—all factual questions— are unrelated to McNeill's argument on appeal that he was entitled to a contested-case hearing—a legal question. McNeill's deadline to notice his appeal does not depend on which issues he later chooses to brief on appeal.

A contrary approach that would require an appellate court to determine whether trial court findings were necessary to the issues briefed—and to declare the notice of appeal untimely if not—presents several problems. That approach is not indicated by the language of Rule 26.1, finds no support in our precedent, creates a trap for unwary litigants to lose their appellate rights, and incentivizes appealing parties to brief issues involving disputed facts that they otherwise might not raise. We decline to adopt such an approach.

In sum, when any party requests findings of fact and conclusions of law following a trial court proceeding in which the court could consider evidence and had evidence before it, the deadline for filing a notice of appeal under Rule 26.1 is ninety days. In uncertain cases, courts should break any tie in favor of the timeliness of the appeal. Because the trial court received evidence in this bench trial and McNeill requested findings, his appellate deadline was ninety days from the trial court's judgment. His notice of appeal filed on the eighty-seventh day was therefore timely, and the court of appeals properly exercised jurisdiction over the appeal.

**II.** **McNeill is entitled to a contested-case hearing, which Commission officials failed to provide.**

    **A.** **An *ultra vires* suit challenging a state official's failure to provide a statutorily required hearing is not barred by sovereign immunity.**

The Commission next contends that the trial court lacked subject-matter jurisdiction because McNeill's suit is barred by sovereign immunity. Sovereign immunity protects the State from lawsuits for money damages. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). The doctrine of sovereign immunity has its origins in the common law and the feudal fiction that "the King can do no wrong." *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015); *see Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). The reasons given for the doctrine "ha[ve] evolved over the centuries," and its modern "purpose is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments." *Tooke v. City of Mexia*, 197 S.W.3d 325, 331–32 (Tex. 2006). Immunity also "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars." *Brown & Gay Eng'g*, 461 S.W.3d at 121.

McNeill argues that sovereign immunity does not apply to this suit because the Commission's officials acted *ultra vires* in denying him a contested-case hearing. Both the courts and the Legislature have recognized that sovereign immunity has limitations and exceptions designed to ensure the rule of law: the fundamental principle that government is subordinate to the law and thus individuals exercising governmental power must respect its limits. *See* TEX. CONST. art. I,

11

§§ 13, 19.[5]  Like sovereign immunity itself, its common-law limitations and exceptions have deep historical roots, tracing their lineage to courts' issuance of writs of habeas corpus, mandamus, and injunction against government officials to check acts in excess of lawful authority or compel the performance of a clear legal duty.[6]

In explaining why mandamus was the correct remedy for a government official's refusal to carry out his ministerial duty to deliver a commission, Chief Justice Marshall in *Marbury v. Madison* looked to the rule of law: "The government of the United States has been emphatically termed a government of laws, and not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."  5 U.S. (1 Cranch) 137, 163 (1803).  The Supreme Court of the United States rejected the argument that "the heads of departments are not amenable to the laws

---

[5] These sections of our Constitution, like the Due Process Clauses of the U.S. Constitution, have an ancient heritage.  In Magna Carta, King John gave sanction to the rule of law by agreeing not to deny free men "right or justice" or deprive them of liberty or property except "by the law of the land."  Charles R. Eskridge III, *Modern Lessons from Original Steps Towards the American Bill of Rights*, 19 TEX. REV. L. & POL. 25, 29 (2016) (quoting Magna Carta (June 15, 1215), reprinted in SOURCES OF OUR LIBERTIES: DOCUMENTARY ORIGINS OF INDIVIDUAL LIBERTIES IN THE UNITED STATES CONSTITUTION AND BILL OF RIGHTS 11, 17 cl. 39–40 (Richard L. Perry & John C. Cooper eds., rev. ed. 1978)).  "Th[e] outlawing by Magna Carta of certain arbitrary and capricious executive action against private citizens went a long way toward establishing" that "the king himself was subordinate to the law," and that his exercise of sovereign authority was not legitimate when he acted outside its bounds. Steven G. Calabresi, *The Historical Origins of the Rule of Law in the American Constitutional Order*, 28 HARV. J. L. & PUB. POL'Y 273, 276 (2004).

[6] *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 GEO. WASH. INT'L L. REV. 521, 524–25 & nn. 7–10 (2003).

of their country," quoting Blackstone's *Commentaries* to show that the common law furnished methods of detecting errors and misconduct by government agents that injured private property rights. *Id.* at 164–65. The Court concluded that when a government official's "powers are limited by statute, his actions beyond those limitations [that affect the plaintiff's property] are considered individual and not sovereign actions," and thus immunity does not bar a suit against him for specific relief. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 701–02 (1949).

Texas courts likewise recognize that an action to determine or protect a private party's rights against a state official who has acted *ultra vires*—that is, without legal or statutory authority—is not a suit against the State that sovereign immunity bars. *See Fed. Sign v. Tex. So. Univ.*, 951 S.W.2d 401, 404 (Tex. 2009). An *ultra vires* suit requires a plaintiff to "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Action without legal authority occurs when "a government officer with some discretion to interpret and apply a law . . . exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (quoting *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016)). Ministerial acts are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459

S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)).

As we have explained, "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state" over one of its officials. *Heinrich*, 284 S.W.3d at 372. "Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy." *Id.* In addition, the modern fiscal rationale for immunity does not apply to *ultra vires* suits: "extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended." *Id.*

The Commission contends that its officials are entitled to sovereign immunity because they were under no duty to provide McNeill with a contested-case hearing, so their failure to do so was not *ultra vires*. McNeill disagrees, arguing that he was entitled to a hearing and the officials are not immune from suit for failing to provide one. McNeill is correct that if he had a statutory right to a hearing, the officials' failure to perform the ministerial act of commencing one is not shielded by sovereign immunity. *See id.* ("[I]t is clear that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity."). As explained below, we agree with McNeill that the Recoupment-Appeal Statute entitled him to have the Commission's Inspector General docket a contested-case hearing. Therefore, the *ultra vires* exception to sovereign immunity applies.

### B. The Recoupment-Appeal Statute gave McNeill a right to a contested-case hearing.

Under the Recoupment-Appeal Statute, "a provider who is the subject of a recoupment of overpayment or recoupment of debt arising

out of a fraud or abuse investigation" may request an administrative hearing regarding the proposed recoupment. TEX. GOV'T CODE § 531.1201(a). Upon receipt of a provider's timely written request for a hearing, "the office of the inspector general shall file a docketing request with the State Office of Administrative Hearings or the Health and Human Services Commission appeals division . . . for an administrative hearing." *Id.* Thus, if the statutory requirements are met, the Inspector General has a ministerial duty to request a hearing.

The parties dispute the correct interpretation of the statute's requirements. Namely, they disagree about whether the modifying phrase "arising out of a fraud or abuse investigation" applies to both "a recoupment of overpayment" and a "recoupment of debt," or only to a "recoupment of debt." The Commission contends that the phrase modifies both types of recoupment, and that a contested-case hearing is available only to providers who are the subject of a fraud or abuse investigation—which the Commission contends McNeill was not. McNeill responds that section 531.1201 creates administrative hearings for two types of recoupments: a "recoupment of overpayment" and "a recoupment of debt arising out of a fraud and abuse investigation." In his view, the first type does not require a fraud or abuse investigation, and it applies here. In the alternative, McNeill argues, it makes no difference whether the statute requires a fraud or abuse investigation because the Commission's definition of "abuse" is broad enough to encompass audits like the one that occurred here.

We agree with McNeill that the definition of "abuse" is broad enough to cover the scope of the Commission's audit, making resolution

15

of the parties' other statutory interpretation dispute unnecessary. A statute enacted in 2013 defines abuse as "a practice by a provider that is inconsistent with sound fiscal, business, or medical practices . . . the reimbursement for services that are not medically necessary or that fail to meet professionally recognized standards for health care; *or a practice by a recipient that results in an unnecessary cost to the Medicaid program*." TEX. GOV'T CODE § 531.1101(1) (emphasis added). The Commission's regulatory definition of abuse is identical. *See* 1 TEX. ADMIN. CODE § 371.1.

These definitions of abuse cover the objective of the program audit here, which was to determine the accuracy of McNeill's billing to the Medicaid Vendor Drug Program and whether he complied with the contractual requirements and program rules. We therefore hold that the Commission's performance audit was an investigation of potential "abuse," entitling McNeill to a contested-case hearing under the Recoupment-Appeal Statute.

The parties note some temporal uncertainty regarding whether the Recoupment-Appeal Statute was in effect at the time of the events relevant here. The statute originally took effect on September 1, 2013,[7] and it applied to pharmacies until new section 531.1203 took effect on September 1, 2015.[8] The Commission initiated its audit in 2012 of

---

[7] *See* Act of May 21, 2013, 83d Leg., R.S., ch. 622, 2013 Tex. Gen. Laws 1677.

[8] Section 531.1203 expressly provides only informal hearings for pharmacies, not contested-case hearings. The relevant portion of that statute reads: "A pharmacy has a right to request an informal hearing before the commission's appeals division to contest the findings of an audit conducted by

16

McNeill's claims from 2007 to 2010, and it issued a final audit report to McNeill in January 2013. But the statute was in effect by February 2014, when the Commission held an informal hearing, reduced the recoupment amount, and issued a final notice demanding payment within thirty days or it would place a vendor hold. McNeill requested a contested-case hearing within thirty days of this notice "that the commission . . . will seek to recover an overpayment," as the Recoupment-Appeal Statute requires. *See* TEX. GOV'T CODE § 531.1201(a). In any event, the Commission concedes the general principle that, in the case of a fraud or abuse investigation, a provider may request a contested-case hearing. Because we have held that the Commission's actions here constituted an abuse investigation, McNeill was entitled to a hearing, and the Inspector General's failure to take the statutorily required act of docketing the hearing request was *ultra vires*.

## III. The court of appeals should not have reached the constitutional due-process issue.

The court of appeals did not pass on this statutory dispute regarding McNeill's entitlement to a hearing, which was fully briefed by the parties below. Instead, the majority "elect[ed] to address rather than ignore the constitutional question presented." 585 S.W.3d at 117. In doing so, the majority erred.

"As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds." *In re B.L.D.*, 113

---

the commission's office of inspector general or an entity that contracts with the federal government to audit Medicaid providers if the findings of the audit do not include findings that the pharmacy engaged in Medicaid fraud." TEX. GOV'T CODE § 531.1203(a) (effective September 1, 2015).

17

S.W.3d 340, 349 (Tex. 2003). This rule is not optional. When an appellate court can provide the appealing party with complete relief on nonconstitutional grounds, it must do so. As demonstrated above, the court of appeals could have decided this case in McNeill's favor on statutory grounds, so it should not have reached the constitutional due-process issue. Accordingly, the majority opinion's analysis of due process should not be considered authority.

CONCLUSION

We hold that McNeill's request for findings of fact and conclusions of law following the trial court's judgment extended the deadline to file an appeal, and McNeill's notice of appeal was therefore timely. We also hold that McNeill was entitled to a contested-case hearing under the Recoupment-Appeal Statute, and that the Inspector General's failure to provide the hearing was *ultra vires* and thus not shielded by sovereign immunity. Accordingly, the trial court erred in granting the plea to the jurisdiction. We reverse the court of appeals' judgment and render judgment declaring that the Inspector General is required to docket a request for a contested-case hearing.

J. Brett Busby
Justice

**OPINION DELIVERED:** December 3, 2021